IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

*FILED IN CHAMBERS*
*U.S.D.C.  Atlanta*

*MAR 19 2008*

*JAMES N. HATTEN, Clerk*
By [signature] *Deputy Clerk*

HECTOR LUNA, JULIAN GARCIA,
FRANCISCO JAVIER LORENZO,
SANTOS G. MALDONADO, PATRICIA
WOODARD and BARTOLO NUNEZ,
Individually and on behalf of
all others similarly situated,

        Plaintiffs,

v.

DEL MONTE FRESH PRODUCE
(SOUTHEAST), INC., and DEL
MONTE FRESH PRODUCE N.A.,
INC.,

        Defendants.

CIVIL ACTION NO.

1:06-CV-2000-JEC

## O R D E R   &   O P I N I O N

This case is presently before the Court on defendant Del Monte
Fresh Produce N.A.'s ("DMNA") Motion for Summary Judgment [197],
defendant Del Monte Fresh Produce Southeast's ("DMSE") Motions for
Summary Judgment [198], [200], and [201], plaintiffs' Motion for
Summary Judgment with respect to DMSA [202], plaintiffs' Motion for
Summary Judgment with respect to DMNE [203], plaintiffs' Motions to
Strike and to Determine the Validity of Defendants' Offers of
Judgment [199] and [216], and Attorney Mary Bauer's unopposed Motion
to Withdraw [229].

The Court has reviewed the record and the arguments of the

parties and, for the reasons set out below, concludes that defendant DMNA's Motion for Summary Judgment [197] should be **GRANTED**; defendant DMSE's Motions for Summary Judgment [198], [200], and [201] should be **DENIED**; plaintiffs' Motion to Strike Defendants' Offers of Judgment [199] should be **GRANTED**; plaintiffs' Motion for Summary Judgment with respect to DMSE [202] should be **GRANTED**; plaintiffs' Motion for Summary Judgment with respect to DMNA [203] should be **DENIED**; plaintiffs' Motion to Determine the Validity of Defendants' Offers of Judgment [216] should be **DENIED as moot**; and Attorney Mary Bauer's unopposed Motion to Withdraw [229] should be **GRANTED**.

**BACKGROUND**

Plaintiffs are migrant and seasonal agricultural laborers who worked on defendant DMSE's Helena, Georgia farms at various times during the 2003, 2004, 2005 and 2006 harvest seasons. (Second Amended Compl. [106] at ¶ 1.) Plaintiffs were recruited to work on DMSE's farms by third-party farm labor contractors ("FLCs"). (*Id.* at ¶ 3.) Plaintiffs Luna, Garcia, and Lorenzo were recruited from Mexico pursuant to the temporary agricultural work visa program commonly known as the "H-2A program." (*Id.* at ¶ 4.) Plaintiffs Maldonado, Woodard and Nunez were recruited from within the United States. (*Id.* at ¶ 5.)

Plaintiffs allege that DMSE: (1) failed to pay the promised wage

2

AO 72A
(Rev.8/82)

rate for all hours worked on its Helena farms; (2) failed to reimburse plaintiffs for costs that they incurred in order to work on the farms; and (3) violated federal laws governing the wages and working conditions of migrant and seasonal agricultural workers. (*Id.* at ¶ 6.)  They filed this lawsuit as a class action on behalf of two distinct classes of workers: (1) H-2A guest-workers recruited from Mexico; and (2) non-H-2A migrant and seasonal agricultural workers recruited from within the United States.  (Second Amended Compl. [106] at ¶¶ 4-5.)

All of the plaintiffs assert claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 ("FLSA"). (*Id.* at ¶ 7.) The H-2A workers also assert claims for breach of contract. (*Id.*) The non-H-2A workers assert claims for breach of the Migrant and Seasonal Agricultural Workers Protection Act, 29 U.S.C. §§ 1801-1871 ("AWPA"). (*Id.*) Plaintiffs assert these claims against DMSE as well as DMSE's parent corporation, DMNA.[1]

Liability under the AWPA and the FLSA is predicated on the existence of an employer-employee relationship.[2] *Patel v. Wargo,* 803

---

[1]  DMSE is a wholly-owned subsidiary of DMNA (DMNA's Statement of Material Facts in Supp. of Summ. J. [197] at ¶ 5.)

[2]  The AWPA and the FLSA use the same definition of the term "employ." *See* 29 U.S.C. § 203(g) and 29 U.S.C. § 1802(5). An entity that employs workers under the FLSA therefore necessarily employs the workers for purposes of the AWPA, and vice versa. *Antenor v. D & S Farms,* 88 F.3d 925, 929 (11th Cir. 1996).

AO 72A
(Rev.8/82)

F.2d 632, 635 (11th Cir. 1986).  Defendants contend that plaintiffs were employed solely by the FLCs who recruited and directly hired plaintiffs.   (Answer [112] at ¶¶ 3-4; Answer [113] at ¶¶ 3-4.) Because the employment issue is potentially dispositive of this case, the parties agreed to a bifurcated discovery schedule, with the first stage of discovery to be focused on the issue of defendants' status as plaintiffs' employer.  (Scheduling Order [66].)

The parties have completed the first phase of discovery, and have filed cross-motions for summary judgment on the employment issue.  (Pls.' Mots. for Summ. J. [202] and [203]; Defs.' Mots. for Summ. J. [197], [198], [200], and [201].)  Plaintiffs have also filed a motion to strike and a motion to determine the validity of defendants' recent offers of judgment to several opt-in plaintiffs. (Pls.' Mot. to Strike [199] and Mot. to Determine Validity of Offers of J. [216].)  All of these motions are presently before the Court.

## DISCUSSION

## I.   Summary judgment motions pertaining to DMSE

### A.   Summary judgment standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  FED. R. CIV. P. 56(c).  A fact's

4

materiality is determined by the controlling substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. (*Id.* at 249-50.)

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. (*Id.* at 322-23 (quoting FED. R. CIV. P. 56(c)).)

The movant bears the initial responsibility of asserting the basis for his motion. (*Id.* at 323.) However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the non-moving party's case." (*Id.* at 325.) After the movant has carried his burden, the non-moving party is then required to "go

5

beyond the pleadings" and present competent evidence designating "'specific facts showing that there is a genuine issue for trial.'" (*Id.* at 324.)   While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."   *Anderson*, 477 U.S. at 247-48 (1986).

The parties have engaged in extensive discovery, and compiled a voluminous record of evidence, related specifically to the employment issue.   They urge the Court to review the facts submitted and determine as a matter of law whether DMSE and/or DMNA is an employer for purposes of the AWPA and the FLSA.   (*See* DMNA's Mot. for Summ. J. [197] at 2 and Pls.' Mot. for Summ. J. [202] at 4.)   The Eleventh Circuit has consistently held that "[a] determination of employment status under the FLSA and the AWPA is a question of law."   *Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996).   *See also Charles v. Burton*, 169 F.3d 1322, 1329 (11th Cir. 1999)(holding same).   The underlying facts that are essential to the employment inquiry are not in dispute.   Accordingly, summary judgment on this issue is proper.

6

**B.    Employer liability under the AWPA and FLSA**

It is undisputed that plaintiffs were directly hired and paid by the various FLCs who recruited them to work on DMSE's Helena farms. (Pls.' Consol. Statement of Material Facts in Supp. of Mot. for Summ. J. ("PSMF") [204] at ¶ 59.)   The FLCs were ostensibly independent contractors who functioned as plaintiffs' employers.   (*Id.*)   That fact does not, however, preclude DMSE's liability as an employer under the AWPA and the FLSA. *See Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1208-09 (11th Cir. 2003).

Both the AWPA and the FLSA broadly define "employer" to include any entity that "suffers or permits" an individual to work.   29 U.S.C. § 203(g) and 29 U.S.C. § 1802(5).   The "suffers or permits" standard gives rise to liability against an entity that, as a matter of economic reality:   (1) jointly employs the workers supplied by the FLC; or (2) utilizes an FLC as an employee, rather than as an independent contractor.   29 C.F.R. § 500.20(h)(4)-(5) and 29 C.F.R. § 791.2(a). *See also Charles,* 169 F.3d at 1334 (holding that growers and labor contractor jointly employed farmworkers) and *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1328 (5th Cir. 1985) (recognizing that where a grower employed a labor contractor, he necessarily employed the contractor's employees).   The evidence in this case suggests that DMSE did both.

AO 72A
(Rev.8/82)

## C.   DMSE "jointly employed" plaintiffs.

The Eleventh Circuit has identified seven factors that are relevant to the joint employment inquiry, including:   (1) the putative employer's power, directly or through the FLC, to direct, control, or supervise the work; (2) the putative employer's power to hire or fire, modify the employment conditions, or determine the pay rates or methods of pay for the workers; (3) the degree of permanency and duration of the parties' relationship; (4) whether the workers perform skilled or unskilled work; (5) whether the workers perform a task that is an integral part of the putative employer's overall business; (6) whether the putative employer owned or controlled the premises where the work occurred; and (7) whether the putative employer undertook responsibilities ordinarily performed by employers. *Charles*, 169 F.3d at 1329. These factors are designed to help the Court determine whether, as a matter of economic reality, plaintiffs were dependent on DMSE. *Id. See also Antenor,* 88 F.3d at 932 ("It is dependence that indicates employee status. Each [factor] must be applied with that ultimate notion in mind."). The undisputed evidence indicates that they were.

### 1.   DMSE had substantial power to direct, control, and supervise the work of FLC workers.

This factor focuses on whether the putative employer takes an "overly active role" in overseeing the work performed by FLC workers.

8

*Martinez-Mendoza*, 340 F.3d at 1209-10 (quoting *Aimable v. Long and Scott Farms,* 20 F.3d 434, 441 (11th Cir. 1994)).  An alleged employer engages in active oversight when it makes such decisions as: (1) whom and how many employees to hire; (2) whom to assign to specific tasks; (3) when work should begin or end each day; (4) when a particular field will be harvested or planted; and (5) whether a worker should be disciplined.  *Id.* at 1210; *Charles*, 169 F.3d at 1329-30.  Control is also exhibited when the employer provides the containers upon which piece rate earnings are based.  *Charles*, 169 F.3d at 1330.

DMSE management instructed the FLCs on a daily basis regarding: how many workers were needed for specific tasks; how many workers should work in each field; which fields to work; how many workers to assign or reassign to specific lines or locations in the warehouse; which warehouse lines to run and at what speeds; and the days on which specific work would begin.  (PSMF [204] at ¶¶ 210-11, 215-19, 302-03, 213-13, 317-22.)   DMSE also provided the containers upon which the workers' piece rate earnings in certain crops were calculated.  (*Id.* at ¶¶ 444-445.)

In addition, DMSE directly monitored and supervised the ·FLC workers throughout the workday.  (*Id.* at ¶¶ 299, 325, 328-330.)  DMSE General Manager Mike Kirby routinely walked through the warehouse for two to three hours each day to observe the progress of the work. (*Id.* at ¶ 331.)  DMSE field supervisors similarly monitored the work

9

being done in the fields.   (*Id.* at ¶¶ 352-358.)   When they observed problems with particular workers, DMSE managers or supervisors either directly confronted the worker or contacted the responsible FLC to address the problem.[3]   (PSMF [204] at ¶¶ 335, 360.)

DMSE attempts to rebut the above evidence with the testimony of various plaintiffs that they did not experience or observe any direct supervision by DMSE personnel.   (*See* DMSE's Response to Pls.' Mot. for Summ. J. [211] at 49-51.)   This testimony is immaterial.   Whether plaintiffs were personally aware of it or not, there is undisputed evidence in the record that DMSE managers frequently monitored and supervised FLC workers.   (*See* PSMF [204] at ¶¶ 331, 335, 352-360.) Moreover, for purposes of this factor, control and supervision "may be either direct or indirect."   29 C.F.R. § 500.20(h)(5)(iv)(A).   *See Charles,* 169 F.3d at 1330 ("[S]upervision is present whenever orders are communicated directly to the laborer or indirectly through the contractor.").   The fact that DMSE may have generally effected supervision by speaking to the FLCs, rather than directly to the workers, "does not negate [DMSE's] apparent on-the-job control over the workers."   *Hodgson v. Griffin & Brand of McAllen, Inc.,* 471 F.2d

---

[3]   DMSE also established and enforced uniform work rules that were applicable to FLC workers, and required the FLCs and their employees to attend safety and sanitation trainings.   (PSMF [204] at ¶¶ 252-57.)

10

235, 238 (5th Cir. 1973).[4]

### 2. DMSE had the power to hire and fire workers, and to modify the conditions of their employment.

At the beginning of each season, DMSE required the FLCs to sign standardized "FLC Agreements" governing the services that the FLCs were to provide to DMSE. (PSMF [204] at ¶¶ 136-150.) DMSE presented the Agreements to the FLCs fully prepared, with jobs and corresponding pay rates and methods of payment (hourly or piece rate) already specified. (Id. at ¶ 150.)

DMSE's argument that the compensation rates in the FLC Agreements were only "estimates" of the amount that the FLCs should pay their workers is unpersuasive. (See DMSE's Response to PSMF [212] at ¶ 150.) The FLCs were not authorized to pay less than the specified rates and, as a practical matter, could not afford to pay more. (PSMF [204] at ¶ 147, 149.) Thus, with few exceptions, DMSE dictated the FLC workers' pay rates and method of payment through the standardized FLC Agreements. (Id. at ¶¶ 136-64.)

DMSE also retained and regularly exercised the right to approve employees selected to fill supervisory positions and positions involving dangerous equipment or machinery. (Id. at ¶ 141.) To that

---

[4] Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

11

AO 72A
(Rev.8/82)

end, DMSE managers identified specific FLC workers whom they wanted

to be helpers, drivers, and quality control individuals. (*Id.* at ¶¶

220-225.) DMSE managers also occasionally identified employees whom

they wanted removed from certain positions. (*Id.* at ¶¶ 228-229.) On

at least one occasion, a DMSE manager suggested to an FLC that a

particular worker should be fired because she was pregnant. (PSMF

[204] at ¶ 228.) The FLC fired the employee based on her

understanding of DMSE's preference. (*Id.*) In several other

instances, DMSE laid off employees and then suggested that these

individuals be hired by an FLC. (*Id.* at ¶¶ 233-40.) The FLCs

generally complied with these requests because they viewed DMSE

management as their "bosses." (*Id.* at ¶¶ 246-51.)

### 3. **The relationship between DMSE and the workers was relatively permanent.**

Recognizing the inherently seasonal nature of most agricultural

work, courts have generally found a sufficiently permanent

relationship to indicate joint employment where labor contractors and

their workers return to a farm year after year for a particular

season of work, or where labor contractors supply their workers

primarily to one grower during a specific harvest or planting period.

*See United States v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir.

1987)("One indication of permanency . . . is the fact that it is not

uncommon for the migrant families to return year after year") and

12

*Barrientos v. Taylor*, 917 F. Supp. 375, 384 (E.D.N.C. 1996) ("the relationship is permanent to the extent that the migrants worked only for defendants during the season").

Rojas Harvesting was DMSE's primary labor contractor, and supplied the majority of workers used in DMSE's Helena operations. (PSMF [204] at ¶ 60.)  Rojas provided laborers to DMSE from 2000 or 2001 until 2006.  (*Id.* at ¶ 62.)  From 2003 until the close of DMSE's operations in 2006, approximately 90% of Rojas business each year derived from work performed for DMSE.  (*Id.* at ¶ 64.)  In 2003, 2004, and 2005, Rojas supplied labor nearly year-round to DMSE.  (*Id.* at ¶ 89.)  This suggests a somewhat permanent and exclusive relationship between Rojas and DMSE.

In addition, several of the plaintiffs testified that they returned to work for DMSE for multiple consecutive onion seasons, and that during those seasons they primarily worked for DMSE.  Plaintiff Patricia Woodard worked exclusively for DMSE during each onion harvest season from April 2003 through June or July 2006.  (*Id.* at ¶ 126.)  Plaintiff Bartolo Nunez returned to DMSE's farms for the 2004, 2005, and 2006 onion harvests.  (PSMF [204] at ¶ 127.)  Opt-in plaintiffs George Allen, Sandreka Madison, Rosa Arias, and C.J. Mason also returned to DMSE's farms for multiple seasons.  (*Id.* at ¶¶ 130-135.)

13

**4.   FLC workers performed unskilled work**.

DMSE concedes that plaintiffs generally performed unskilled work.   (DMSE's Response to PSMF at ¶ 373; DMSE's Mem. in Supp. of Mot. for Summ. J. [200] at 15.)   This factor thus weighs in favor of a joint employment relationship.   *Charles*, 169 F.3d at 1332 ("The lower the worker's skill level, the lower the value and marketability of his/her services and the greater the likelihood of his/her economic dependence on the person utilizing those services.").

**5.   DMSE owned or leased the premises where the work occurred**.

DMSE also concedes that it owned or leased the land on which the work at issue was performed.   (PSMF [204] at ¶¶ 438-39.)   As the Eleventh Circuit explained in *Antenor*:   "[A] business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors."   *Antenor*, 88 F.3d at 937. Accordingly, this factor weighs in favor of joint employment.   *Id.* *See also Charles*, 169 F.3d at 1333.

**6.   FLC workers performed tasks that are an integral part of DMSE's overall business**.

During the relevant time period, DMSE was engaged in the business of growing and packaging fresh produce in the Helena, Georgia area.   (PSMF [204] at ¶¶ 5, 21-24.)   Plaintiffs and other FLC workers performed the planting, harvesting, and packing of DMSE's

14

AO 72A
(Rev.8/82)

produce.   This work clearly was integral to DMSE's operations and overall business.   *See Charles*, 169 F.3d at 1333 ("picking of snap beans was integral to both harvesting and producing of snap beans").

### 7.   DMSE undertook at least some responsibilities that are ordinarily performed by employers.

Examples of tasks that are ordinarily performed by employers include: (1) preparing or making payroll records; (2) preparing or issuing paychecks; (3) paying FICA taxes; (4) providing workers' compensation insurance; (5) providing field sanitation facilities, housing, or transportation; and (6) providing tools, equipment, or materials required for the job. *Martinez-Mendoza*, 340 F.3d at 1214. The FLCs prepared their own payrolls and issued paychecks without assistance from DMSE.   (DMSE's Statement of Undisputed Material Facts in Supp. of Summ. J. ("DMSE's SMF") [200] at ¶ 129.)   The FLCs also performed their own tax calculations and independently made these deductions.   (*Id.* at ¶ 130.)   In addition, the FLCs independently obtained liability and workers' compensation insurance.   (*Id.* at ¶ 137.)

On the other hand, DMSE maintained labor camps in which it provided free housing to numerous FLC workers between 2003 and 2006. (PSMF [204] at ¶¶ 461-68.)   DMSE paid for most costs associated with the housing, including major repairs, routine maintenance, and utility bills.   (*Id.* at ¶¶ 472-73.)   DMSE also assisted Rojas in

15

obtaining housing for workers for whom there was no room at the camps during the 2006 onion harvest season. (*Id.* at ¶ 469.)  As part of these efforts, DMSE executed a contract addendum with subsidies for outside housing, and suggested to Ms. Rojas where she should look for worker housing. (*Id.*)

In addition, DMSE provided FLC workers with the majority of the tools, materials, and equipment that were essential to their work. (*Id.* at ¶¶ 440-47.)  DMSE provided and serviced all the forklifts, tractors, and other field and warehouse machinery used in the Helena operations. (PSMF [204] at ¶ 442.)  DMSE also provided the fuel required for the equipment. (*Id.* at ¶ 443.)  DMSE further provided sacks in which field workers placed harvested onions, and all the bins and boxes used to harvest, load, and pack onions and other produce. (*Id.* at ¶¶ 444-45.)  In the 2006 onion harvest season, DMSE arranged and paid for sanitation facilities on its Helena farms. (*Id.* at ¶ 453.)

The evidence on this factor thus indicates that DMSE and its FLCs each performed discrete tasks routinely performed by an employer.  Nevertheless, DMSE's provision of most of the tools, materials, and services critical to plaintiffs' work suggests that plaintiffs were economically dependent on DMSE.  See *Charles*, 169 F.3d at 1333 n. 15 ("workers who use the services, materials or functions [provided by a putative employer] are in a very tangible

16

way economically dependent on the entity performing these functions").

### 8.  Conclusion

All of the relevant factors weigh in favor of joint employment, and the evidence in the record overwhelmingly suggests that plaintiffs were at least as economically dependent on DMSE as they were on their FLCs. Plaintiffs' motion for partial summary judgment as to DMSE [202] is therefore **GRANTED**, and DMSE's motions for summary judgment [198], [200], and [201] are **DENIED**.

### D.  DMSE utilized Rojas Harvesting as an employee.

In addition to its status as a joint employer of plaintiff, DMSE also effectively employed its primary labor contractor. This fact offers additional support to grant plaintiffs' motion for summary judgment. Specifically, the evidence in the record further suggests that Letisia Rojas Salazar, DMSE's primary labor contractor, functioned as an employee of DMSE as opposed to an independent contractor.[5] The DOL has identified six factors that are relevant to determine whether an FLC is a bona fide independent contractor or an employee. 29 C.F.R. § 500.20(h)(4). These factors, which overlap

---

[5]  In 2001 or 2002, DMSE offered Ms. Rojas a position as DSME's primary labor contractor. (PSMF [204] at ¶ 63.) Ms. Rojas subsequently became, and at all relevant times was, the Rojas family member most actively involved in directing and overseeing Rojas Harvesting's provision of workers to DMSE. (Id. at ¶¶ 63, 69-70-73.)

17

substantially with the factors discussed above, include:  (1) the nature and degree of the putative employer's control as to the manner in which the work is performed; (2) the putative employee's opportunity for profit or loss depending on his/her managerial skill; (3) the putative employee's investment in equipment or materials required for the task, or the putative employee's employment of other workers; (4) whether the services rendered by the putative employee require special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the services rendered by the putative employee are an integral part of the putative employer's business.

As discussed, DMSE retained and regularly exercised substantial control over the work performed by the FLCs.  In addition, Rojas had a relatively permanent and exclusive relationship with DMSE, and the work performed by Rojas' FLC workers was unquestionably integral to DMSE's business.  The evidence on these factors therefore suggests that Rojas functioned as an employee of DMSE.  The remaining factors also support an employment relationship.

### 1.  **Rojas had a limited opportunity for profit or loss based on her managerial skill**.

Rojas earned a profit on her work for DMSE by means of a standard surcharge specified in the FLC Agreements.  (PSMF [204] at ¶¶ 136-149.)  As noted, the FLC Agreements listed various jobs and

18

their corresponding rates of pay, including whether payment would be made on an hourly or piece rate basis for specific jobs. (*Id.* at ¶¶ 142-146.)   The total payment that Rojas received was calculated by applying a 32% surcharge to both hourly and piece rate work. (*Id.* at ¶¶ 144, 147.)   The 32% surcharge was specifically calculated as a percentage necessary to cover the FLC's costs for insurance and employment taxes, as well as to provide some profit to the FLC. (*Id.* at ¶ 149.)   As a practical matter, this arrangement provided very little if any opportunity for Rojas to apply her "managerial skill" to increase profit.

Rojas' opportunity for loss was similarly limited, because she did not make any significant investment in work-related equipment or materials.   DMSE owned or leased all of the land on which the work occurred, and supplied all of the heavy equipment and machinery used in its operations, including tractors, forklifts, fuel, fertilizers and pesticides, irrigation equipment, and the components of the warehouse packing lines. (*Id.* at ¶¶ 438-47.)   DMSE also paid most of the costs associated with maintaining two labor camps primarily used for housing Rojas workers. (PSMF [204] at ¶¶ 461-66.)   Rojas only provided plastic buckets, basic hand tools such as onion clippers, and a few vehicles in which workers were transported. (*Id.* at ¶¶ 440-47, 454.)   Given the limited nature of her investment, Rojas' opportunity for loss was practically nonexistent. *See Haywood v.*

AO 72A
(Rev.8/82)

*Barnes*, 109 F.R.D. 568, 588 (E.D.N.C. 1986) (noting that the labor contractors' investment in "some light tools and a few scattered buses and trucks" was minimal in comparison with the grower's investment in land, housing, storage facilities, equipment, tools, and supplies)

### 2. The vast majority of Rojas' workers primarily worked at DMSE's Helena operations.

Although Rojas supplied some workers to farms other than DMSE, 90% of Rojas' business between 2003 and 2006 derived from work performed at DMSE's Helena operations. (PSMF [204] at ¶ 64.) In a succession of letters supporting Rojas' applications for H-2A workers, DMSE indicated its intent to utilize all of the H-2A workers requested by Rojas in 2003, 2004, 2005, and 2006. (*Id.* at ¶ 278-281.) The number of workers that Rojas supplied to other farms, and the amount of time those workers spent working on other farms, were insignificant compared to the workers supplied to, and time spent on, DMSE's Helena farms.

### 3. Ms. Rojas had limited skills and training.

Ms. Rojas was 18 years old when DMSE offered her a position as its primary labor contractor. (*Id.* at ¶ 63.) Although she was experienced in farmwork when she accepted the labor contractor position, Rojas did not have any specialized training in agriculture or in farm labor contracting. (*Id.* at ¶ 78.) In fact, she dropped

20

out of school in the ninth grade.   (*Id.* at ¶ 78.)

Ms. Rojas was undoubtedly proficient in performing numerous duties for DMSE, including recruiting, hiring, training, and supervising workers.   (*See* DMSE's Response to Pls.' Mot. for Summ. J. [211] at 40.)   She also showed initiative in communicating with the DOL regarding contracting and housing matters, working with an accounting firm to prepare her payroll, and consulting with an agricultural firm regarding the H-2A recruitment process.   (*Id.*) However, there is no evidence that she brought a particularly specialized set of skills to DMSE.   *See Beliz*, 765 F.2d at 1328 (holding that a contractor who provided "routine supervision of the kind commonly given by foremen" was an employee of the grower).

### 4.   Conclusion

All of the relevant factors suggest that Rojas functioned as DMSE's employee.   Accordingly, DMSE necessarily employed Rojas' workers for purposes of the AWPA and the FLSA.   *See Beliz*, 765 F.2d at 1328.   For this additional reason, DMSE's motions for summary judgment [198], [200], and [201] are **DENIED**, and plaintiffs' motion for partial summary judgment with respect to DMSE [202] is **GRANTED**.

## II.   Summary judgment motions pertaining to DMNA

Plaintiffs have named DMSE's parent corporation DMNA as a defendant in this litigation.   DMNA is in the business of marketing

AO 72A
(Rev.8/82)

and selling produce that it purchases from either its wholly-owned subsidiaries or from various third parties.  (DMNA's Statement of Material Facts in Supp. of Summ. J. ("DMNA's SMF") [197] at ¶ 3.)  In 1998, DMNA acquired Grimes Farm, an existing agricultural entity in Helena, Georgia.  (*Id.* at ¶ 4.)  At that time, DMSE was formed and incorporated, with its holdings containing the former Grimes Farm.  (*Id.*)  DMSE then became a wholly-owned subsidiary of DMNA.  (*Id.* at ¶ 5.)  DMSE and DMNA subsequently maintained a working relationship by which DMSE sold most of the produce it harvested to DMNA at a 3% markup.  (*Id.* at ¶ 10.)

As discussed above, liability under the AWPA and the FLSA is premised on an employment relationship.  *Patel,* 803 F.2d at 636.  DMNA cannot be held liable to plaintiffs under the AWPA and FLSA simply because its wholly-owned subsidiary employed plaintiffs.  *Id.* Plaintiffs must instead prove that DMNA also jointly employed plaintiffs, or that there is an alternative basis for holding DMNA liable for the actions of its subsidiary.  Plaintiffs have not met this burden.

**A.    DMNA did not jointly employ plaintiffs.**

Applying the seven-factor economic realities test described above, there is no evidence in the record to suggest that DMNA jointly employed plaintiffs.

AO 72A
(Rev.8/82)

### 1.  **DMNA did not control, direct, or supervise plaintiffs.**

DMNA was not at all involved in supervising either the FLCs or their employees.  (DMNA's SMF [197] at ¶ 69.)  Plaintiffs concede that DMNA personnel did not directly communicate with the FLC workers.  (Pls.' Response to DMNA's SMF [208] at ¶ 69.)  In addition, the FLCs testified that they had never communicated with DMNA or any member of its management.  (DMNA's SMF [197] at ¶ 69.)  There is thus no evidence that DMNA controlled or supervised the workers indirectly via the FLCs.  The only evidence on this factor is that a small number of DMNA employees visited DMSE's facilities on an infrequent basis for meetings with DMSE employees to discuss sales, production, accounting, and other issues.  (DMNA's SMF [197] at ¶ 13; Pls.' Response to DMNA's SMF [208] at ¶ 13.)  These activities do not rise to the level of "active oversight" of the work performed by the FLC workers.  *See Aimable*, 20 F.3d at 440-41.

### 2.  **DMNA did not have or exercise the right to hire, fire, or modify workers' employment conditions**.

There is no evidence that DMNA determined or had the power to determine plaintiffs' pay rates or payment method.  While DMNA officers reviewed the FLC Agreements, they never altered the pay rates contained within them.  (DMNA's SMF [197] at ¶ 63.)  Instead, the pay rates and methods of pay were determined and approved by DMSE's General Manager.  (*Id.* at ¶ 60.)  Neither is there any

23

evidence that DMNA was at all involved in the recruitment, hiring or firing of any of the FLCs or their workers.  (Pls.' Response to DMNA's SMF [208] at ¶¶ 65-66.)  DMNA's limited involvement in DMSE's operations does not constitute indicia of joint employment under this factor.  *See Beck v. Boce Group, L.C.*, 391 F. Supp. 2d 1183, 1188-90 (S.D. Fla. 2005) (finding that a parent corporation did not exercise control over the employees of its subsidiary, although the parent consulted with the subsidiary on employment matters and required distribution of an employee handbook).

### 3.   **Plaintiffs did not have a permanent relationship with DMNA.**

The FLCs entered into contracts with DMSE, not DMNA.  (DMNA's SMF [197] at ¶ 54.)  There is no evidence that DMNA had any kind of relationship with plaintiffs or their FLCs, much less a relationship of such permanency or exclusivity to justify a finding of joint employment.  *See Martinez-Mendoza,* 340 F.3d at 1212 (discussing permanency factor).

### 4.   **Plaintiffs performed unskilled work.**

As noted above, it is undisputed that plaintiffs' jobs were unskilled.  This factor thus weighs slightly in favor of joint employment.

### 5.   **Plaintiffs' jobs were not integral to DMNA's business.**

DMNA is in the business of marketing and selling produce that it

24

purchases from either its wholly-owned subsidiaries or various third parties. (DMNA's SMF [197] at ¶ 3.) DMNA can and does purchase produce from a number of growers other than DMSE. (*Id.*) It is not dependent on produce purchased from DMSE. (*Id.* at ¶ 7.) Plaintiffs' work is therefore not indispensable or integral to DMNA's overall business. *Compare Antenor*, 88 F.3d at 937 (finding that farmworkers were "one small but indispensable part" of the growers' overall production process).

### 6. DMNA did not own or control the premises on which the work occurred.

DMSE leased all of the fields, and owned the warehouse, in which plaintiffs worked.[6] (DMNA's SMF [197] at ¶¶ 6-8.) There is no evidence that DMNA had any interest in these properties.

### 7. DMNA did not undertake any responsibilities commonly performed by employers.

The Court found above that both DMSE and the FLCs performed some of the tasks that are ordinarily performed by employers, with the FLCs assuming responsibility for payroll functions and DMSE providing housing, equipment, and tools. There is no evidence that DMNA undertook any of these responsibilities. *See Gonzalez-Sanchez v. Int'l Paper Co.*, 346 F.3d 1017, 1023 (11th Cir. 2003) (holding that defendant did not jointly employ plaintiffs where there was no

---

[6] The warehouse was marked with a sign reading "Del Monte Fresh Produce Southeast." (DMNA's SMF [197] at ¶¶ 7-8.)

evidence that it issued paychecks, withheld taxes, or provided insurance, housing, transportation, or tools to plaintiffs).

**B.   There is no other basis for holding DMNA liable.**

Plaintiffs essentially concede that they cannot demonstrate a joint employment relationship under the test articulated above. (*See* Pls.' Response to DMNA's Mot. for Summ. J. [208].)   However, plaintiffs suggest that DMNA should be held liable to plaintiffs because: (1) DMNA is the parent corporation of DMSE and exercised "substantial control" over DMSE's operations; (2) DMNA and DMSE constitute an integrated enterprise; and (3) DMSE was DMNA's agent with respect to plaintiffs.   (*Id.*)   These arguments are not persuasive.

The Eleventh Circuit repeatedly has indicated that the seven-factor joint employment analysis is the proper standard to determine FLSA and AWPA liability for multiple entities, including two related corporate entities.   *See Martinez-Mendoza*, 340 F.3d at 1207-08; *Patel*, 803 F.2d at 637.   In fact, the *Patel* Court specifically rejected the approach that plaintiffs recommend, stating: "There is no case holding that the individual entities which make up an enterprise should be jointly and severally liable for another entity's employees solely because they are members of the enterprise."   *Patel*, 803 F.2d at 635.   *See also Lane v. Capital Acquisitions and Mgmt. Co.*, 2007 WL 676019 at *4 (S.D. Fla

26

2007)("Under the FLSA, courts apply the economic realities test to determine whether a parent is, in fact, a joint employer for purposes of the FLSA.") and *Kaplun v. Lipton*, 2007 WL 707383 at *3 (S.D. Fla. 2007)("in order for all the corporate Defendants in this action to be liable for Plaintiff's overtime claim Plaintiff must establish their liability as her employer through a joint employer analysis").

Moreover, the evidence does not support plaintiffs' alternative theories of liability, which all assume that DMNA exercised "substantial control" over DMSE.  The evidence overwhelmingly suggests that DMSE conducted its business independently from DMNA. (DMNA's SMF [197] at ¶¶ 14-35.)  DMNA's involvement in DMSE's daily operations was limited.  (*Id.*)  More importantly, DMNA had no involvement whatsoever with plaintiffs or the FLCs.  *See Greason v. Se. R.R. Assoc. Bureaus,* 650 F. Supp. 1, 4 (N.D. Ga. 1986)("For the agency theory, the claimant must show that one entity acted as the other's agent *with respect to employment practices.*")(emphasis added) and *Llampallas v. Mini-Circuits, Lab, Inc.,* 163 F.3d 1236, 1244-45 (11th Cir. 1998)(the integrated enterprise theory concentrates on the "degree of control an entity has over the adverse employment decision on which the [plaintiffs'] suit is based.").  Accordingly, DMNA's motion for summary judgment [197] should be **GRANTED**, and plaintiffs' motion for partial summary judgment as to DMNA [203] should be **DENIED**.

27

## III. <u>Plaintiffs' motions to strike or determine the validity of defendants' offer of judgment</u>

The named plaintiffs filed this action on behalf of themselves and other similarly situated migrant farmworkers. (*See* Amended Compl. [55].) Shortly after plaintiffs filed their amended complaint, they filed motions for class certification and for certification as an FLSA collection action. (Pls.' Mot. to Certify Class [73] and Mot. to Certify FLSA Collective Action [84].) Subsequently, 47 plaintiffs opted into the lawsuit. (Pls.' Br. in Supp. of Mot. to Strike [199] at 2.) Defendants have issued Rule 68 offers of judgment to 42 of the opt-in plaintiffs. (*Id.* at 6.) Plaintiffs move to strike or invalidate those offers. (Pls.' Mot. to Strike Offers of J. [199]; Pls.' Mot. to Determine Validity of Offers of J. [216].)

Pursuant to Rule 68, a defendant may make an offer of judgment to a plaintiff any time up to ten days prior to trial. FED. R. CIV. P. 68. If the plaintiff rejects the offer of judgment, and ultimately recovers less at trial than the amount specified in the offer, he must pay the defense costs incurred after the date of the offer. *Id.* Plaintiffs contend that defendants' offers are inappropriate in the context of an FLSA collective action. (Pls.' Mot. to Strike [199] at 7.) They seek judicial clarification of the issue because rejecting the offers may prejudice plaintiffs in the

28

eventual assessment of costs.   (*Id.*)

The Eleventh Circuit has held that FLSA claims may only be abridged or settled after a court reviews the proposed settlement to ensure that it is fair and reasonable.   *Lynn's Food Stores, Inc. v. United States,* 679 F.2d 1350, 1352-53 (11th Cir. 1982).   As the Court explained in *Lynn's Food*:

> There are only two ways in which back wage claims arising under the FLSA can be settled or compromised by employees.   First, under section 216(c), the Secretary of Labor is authorized to supervise payment to employees of unpaid wages owed to them. . . . The only other route for compromise of FLSA claims is provided in the context of suits brought directly by employees against their employer under section 216(b) to recover back wages for FLSA violations.   When employees bring a private action for back wages under the FLSA, and present to the district court a proposed settlement, the district court may enter a stipulated judgment after scrutinizing the settlement for fairness.

*Id.* at 1353.

Defendants have not presented its Rule 68 offers to the Court for approval, with good reason.   At this stage in the litigation, there is absolutely no basis for determining whether the offers are fair and reasonable.   The parties have not conducted any merits discovery or provided even an estimate as to the amount plaintiffs might be entitled to recover on their FLSA and AWPA claims.   *See Yates v. Applied Performance Tech., Inc.,* 205 F.R.D. 497, 503 (S.D. Ohio 2002)(holding that it would be inappropriate to compel plaintiffs to accept an offer of judgment where it was unclear how

AO 72A
(Rev.8/82)

much plaintiffs were owed) and *Rubery v. Buth-Na-Bodhaige, Inc.,* 494 F. Supp. 2d 178, 181 (W.D.N.Y. 2007)(noting that courts have "traditionally been wary of attempts by defendants to evade FLSA collective actions by making Rule 68 offers of judgment at the earliest possible time"). The amount specified in the offers appears to have been randomly selected.

Defendants' settlement offers have not been, and at this stage in the litigation cannot be, reviewed or approved by the Court. The offers are thus invalid under *Lynn's Food*. Accordingly, the Court **GRANTS** plaintiffs' motion to strike defendants' Rule 68 offers [199] and **DENIES as moot** plaintiffs' motion to determine the validity of the offers [216]. Pursuant to this ruling, plaintiffs are not subject to the consequences of refusing the offers under Rule 68.

### CONCLUSION

For the foregoing reasons, the Court finds that defendant DMNA's Motion for Summary Judgment [197] should be **GRANTED**; defendant DMSE's Motions for Summary Judgment [198], [200], and [201] should be **DENIED**; plaintiffs' Motion to Strike Defendants' Offer of Judgment [199] should be **GRANTED**; plaintiffs' Motion for Summary Judgment with respect to DMSE [202] should be **GRANTED**; plaintiffs' Motion for Summary Judgment with respect to DMNA [203] should be **DENIED**; plaintiffs' Motion to Determine the Validity of Defendants' Offer of

30

Judgment [216] should be **DENIED as moot**; and Attorney Mary Bauer's unopposed Motion to Withdraw [229] should be **GRANTED**.

SO ORDERED, this 18 day of March, 2008.

JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)